13-4880
*United States of America v. Foreste*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

––––––––––––––––

August Term, 2014

(Argued: November 12, 2014     Decided: March 11, 2015)

Docket No. 13-4880

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

MICHAEL J. FORESTE,

*Defendant-Appellant.*

––––––––––––––––

Before: POOLER, PARKER, and WESLEY, *Circuit Judges.*


Defendant-Appellant Michael J. Foreste appeals from a judgment of conviction imposed by the United States District Court for the District of Vermont (Sessions, J.) following his conditional guilty plea to a charge that he possessed oxycodone with intent to distribute.  On appeal Foreste (1) renews his argument that evidence obtained in two successive motor vehicle stops should

be suppressed because the length of the investigatory detentions were collectively unreasonable, and (2) argues that the district court erred in denying his discovery request for the field performance records of the narcotics canine whose alert provided the probable cause for his arrest. AFFIRMED in part and VACATED and REMANDED in part for discovery of the narcotics canine's field performance records.

> BRADLEY STETLER, Stetler, Allen & Kampmann, Burlington, VT, *for Defendant-Appellant*.
>
> WENDY L. FULLER, Assistant United States Attorney (Gregory L. Waples, *on the brief*), for Tristram J. Coffin, United States Attorney for the District of Vermont, Burlington, VT, *for Appellee*.

WESLEY, *Circuit Judge*:

After two successive traffic stops in Vermont and Massachusetts, Defendant-Appellant Michael J. Foreste was found to be in possession of oxycodone, a controlled substance. He entered a conditional guilty plea, but preserved his right to challenge the district court's denial of his motion to suppress. On appeal he argues (1) that the duration of the two successive traffic stops was unreasonably intrusive in violation of the Fourth Amendment, and (2) that the district court erred in denying his discovery request for the field performance records of the narcotics canine whose alert provided the probable cause for his arrest.

For the reasons below, the judgment of the district court is AFFIRMED in part and VACATED and REMANDED in part for discovery of the narcotics canine's field performance records.

## BACKGROUND[1]

On April 2, 2012, Defendant Michael Foreste was traveling from New York City to Vermont in a rental car driven by Telly Cesar. As the two were traveling north on Interstate 91, Massachusetts State Trooper Rachel Loiselle pulled the vehicle over for speeding at 12:50 p.m. in Hatfield.

Trooper Loiselle testified that when she approached the vehicle and began speaking with Cesar and Foreste, she quickly became suspicious. Cesar mumbled his response to Loiselle's request for his license and registration; when she asked Cesar to repeat himself, Foreste answered; and, without being asked, Foreste proceeded to explain the details of their trip to Vermont. Foreste also gave Trooper Loiselle a rental agreement for the car that she testified "was expired by quite some time, perhaps as much as a month." Supplemental App. 78.

---

[1] Except as otherwise noted, the facts are not in dispute and are drawn from the district court's opinion, supplemented as necessary by the record.

Trooper Loiselle returned to her police cruiser to review the paperwork and, suspecting that the two might be involved in criminal behavior, contacted Sergeant Eric Albright of the Vermont State Police. Loiselle thought Sergeant Albright might have additional information on Cesar or Foreste because Foreste is a Vermont resident and the rental car was registered in his name. Albright told Loiselle that he did not know anything about Cesar or Foreste, but said that he would call some of his contacts and try to find out more.

Trooper Loiselle also called her dispatch officer. She was concerned that the vehicle might have been stolen and asked her dispatch officer to contact the rental car company about the expired rental agreement. Loiselle then returned to the stopped vehicle to explain that there would be a delay because of the expired rental agreement. At that point Foreste handed Loiselle a second rental agreement, also expired, but which had expired more recently than the first.

Within a few minutes, the rental car company confirmed that there was no problem with the expired rental agreement as long as the vehicle was ultimately returned. The driver, Cesar, was issued a ticket for speeding, and Trooper Loiselle released the car at approximately 1:12 p.m. The stop lasted a total of twenty-two minutes.

4

After the vehicle departed, Sergeant Albright returned Trooper Loiselle's call. Albright had contacted Detective Dan Merchand of the Burlington Police Department and learned that, according to Detective Merchand's confidential informant, Foreste was a known cocaine and oxycodone dealer who transported large quantities of drugs from New York City to the Burlington area in rental vehicles.

Sergeant Albright decided to drive from the Brattleboro barracks to I-91, near Guilford, hoping to encounter Cesar and Foreste as they continued north into Vermont. Given the information he had obtained about Foreste's suspected drug trafficking, Albright decided "to try and find a motor vehicle violation if at all possible," Supplemental App. 50, in order to justify a stop of the vehicle. At the same time, Albright called Special Agent Thomas Doud of the Drug Enforcement Administration. Albright had learned from Detective Merchand that Special Agent Doud was investigating Foreste in conjunction with Merchand, and Albright hoped that Doud might have additional information on Foreste or Cesar. Albright, however, was unable to reach Doud and so left him a voice mail. Albright also called Inspector Mark Heberts from the Vermont Department of Motor Vehicles. Inspector Heberts is a canine handler who works

5

with a narcotics-certified canine named Duchess Corrie.  Albright asked Heberts

to start driving in Albright's direction so that he would be available in the event

Albright needed a drug-sniffing dog.  When Albright spoke with him, Heberts

was in Londonderry, Vermont, about an hour away from Albright's location.

At approximately 1:38 p.m., Sergeant Albright located Foreste's rental car

at the Welcome Center in Guilford, Vermont.  Albright saw the vehicle roll

through a stop sign while exiting the parking lot and also observed an item

hanging from the rearview mirror—both violations of Vermont motor vehicle

laws.  At approximately 1:40 p.m., Albright stopped Foreste's car on I-91

northbound after following the vehicle for one to two miles.

Sergeant Albright approached the vehicle and spoke with Cesar and

Foreste.  Albright requested Cesar's driver's license and noticed that Cesar

mumbled when he spoke and was somewhat difficult to hear.  Albright also

observed what he believed to be marijuana "chafe" on Cesar's pants.  He ordered

Cesar to get out of the car "to further investigate whether or not he was in

possession of narcotics and/or under the influence and operating the vehicle as

such at that point."  Supplemental App. 19.  Albright then asked Cesar whether

he had anything on his person that could hurt Albright, and, when Cesar

6

indicated that he did not, the two proceeded to Albright's vehicle. As the two sat in Albright's car, Albright examined the rental agreement, reviewed Cesar's license, and checked for warrants. Albright also questioned Cesar about his occupation, his relationship with Foreste, and the details of his trip. Albright gave Cesar a written warning for the obstructed windshield and for failing to stop at the stop sign, and the two exited the police vehicle. The interaction with Cesar lasted approximately seven to ten minutes.

Sergeant Albright then reapproached the car to speak with Foreste, who remained seated in the vehicle. Albright asked Foreste a series of questions similar to those he had posed to Cesar—where the two men were traveling, whether Cesar was in possession of marijuana, and whether Cesar may have smoked marijuana earlier. As he questioned Foreste, Albright observed that Foreste's hands were shaking and that his abdomen was pulsating heavily. During their conversation Albright also noticed white residue on the hair inside Foreste's nostrils, which he deemed consistent with someone who has nasally ingested cocaine or other powdered narcotics.

At around 1:52 p.m., Sergeant Albright asked Foreste for consent to search the vehicle, which Foreste refused. At this point, Albright testified, they "were

kind of in a holding pattern" because Albright knew that Inspector Hebert was on his way with Duchess Corrie, and he wanted to wait for the drug-sniffing dog to arrive. Supplemental App. 25. At approximately 1:54 p.m., while detaining Foreste and Cesar, Albright had a telephone conversation with Special Agent Doud. Doud informed him, as had Detective Merchand earlier, that Foreste was involved in cocaine and oxycodone distribution in the Burlington area. Doud also told Albright that narcotics canines had positively alerted to the odor of narcotics on three rental cars returned by Foreste in the past few months. After speaking with Doud, Albright explained to Foreste and Cesar that he planned to wait for a narcotics canine to arrive and sniff around the outside of the car.

Inspector Heberts and his narcotics canine, Duchess Corrie, arrived at 2:18 p.m.[2] When they performed an exterior scan of the vehicle, the dog alerted to the presence of narcotics at a number of locations on the vehicle, including the driver's-side door seam, the trunk, and the passenger's-side door. Inspector Heberts testified that when the dog approached the open passenger window where Foreste was seated, she got up on the door sill, stuck her head in, took a

---

[2] Foreste challenges the district court's finding that Inspector Heberts arrived at 2:18 p.m., noting that Heberts himself testified that he did not arrive until twenty minutes later, at 2:38 p.m. But, as the district court observed, the later arrival time is inconsistent with both Sergeant Albright's testimony and Albright's radio log, both of which place Heberts' arrival before 2:38. We see no clear error in the district court's finding.

deep inhalation, and alerted to the presence of drugs by scratching with her paw.

Sergeant Albright then advised Foreste that under Vermont law he could either

consent to a search of the car or require Albright to seek a search warrant.

Foreste refused consent, and so Albright secured the vehicle for towing by asking

Foreste to exit the vehicle, detaining him in handcuffs, and calling to request a

wrecker to tow the vehicle to the barracks pending application for a warrant.  At

2:31 p.m., Albright detained Foreste for transportation back to the barracks.

Sergeant Albright detained Foreste in a holding cell at the state police

barracks while waiting for the search warrant to issue.  A Vermont state judge

signed a warrant to search Foreste's vehicle at approximately 6:05 p.m.  The

ensuing search uncovered prescription pills not in their designated container,

one of which was a controlled substance under Vermont law and illegal to

possess without a valid prescription.  Albright then arrested Foreste and

searched him incident to that arrest.  When Sergeant Albright searched Foreste's

underpants, he found two bags containing over 600 oxycodone pills.

Foreste was charged in the United States District Court for the District of

Vermont with knowingly and intentionally possessing with intent to distribute

oxycodone, a Schedule I controlled substance.  Foreste did not contest his guilt,

but argued (1) that the evidence against him should be suppressed because the successive detentions by the Massachusetts and Vermont State Police were unreasonably intrusive in violation of the Fourth Amendment, and (2) that he should be given access to the narcotics canine's field performance records in support of his defense that the dog was insufficiently reliable.

Following a suppression hearing and a special hearing for cross-examination of the narcotics canine's handler, the district court rejected both arguments. *United States v. Foreste*, No. 2:12–cr–0091, 2013 WL 4710591 (D. Vt. May 7, 2013). The court sentenced Foreste to twelve months and one day of imprisonment to be followed by three years of supervised release; Foreste's conditional guilty plea preserved his right to appeal the denial of his motion to suppress and motion for discovery.

## DISCUSSION[3]

### I.     Foreste's Motion to Suppress

---

[3] When reviewing an appeal from a denial of a motion to suppress, this Court reviews a district court's factual findings for clear error and its conclusions of law de novo. *See United States v. Lucky*, 569 F.3d 101, 105–06 (2d Cir. 2009). We review a district court's discovery rulings under Federal Rule of Criminal Procedure Rule 16 for abuse of discretion. *See United States v. Rigas*, 583 F.3d 108, 125 (2d Cir. 2009). A district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), or renders a decision that "cannot be located within the range of permissible decisions," *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

Foreste concedes that separate traffic infractions supported the
Massachusetts and Vermont stops. Nor does Foreste contest the Government's
assertion that reasonable suspicion of criminal activity supported extension of
the stops for investigatory purposes. Instead, Foreste argues that the two stops'
combined duration was unreasonably intrusive in violation of the Fourth
Amendment and that the district court erred in denying his motion to suppress
the evidence seized from him as a result of those stops.

Traffic stops are presumptively reasonable under the Fourth Amendment
if the officer has probable cause to believe that a traffic infraction has occurred.
*Whren v. United States*, 517 U.S. 806, 810 (1996). If an officer has observed a traffic
violation, his actual motivation for stopping the vehicle is irrelevant to whether
the stop is constitutionally reasonable. *Id.* at 813. During a stop, an officer may
question the occupants of a vehicle about matters unrelated to the stop as long as
the inquiries do not measurably extend the duration of the stop. *Arizona v.
Johnson*, 555 U.S. 323, 333 (2009). A traffic stop may be extended for investigatory
purposes if an officer develops a reasonable suspicion of criminal activity
supported by specific and articulable facts. *See United States v. Glover*, 957 F.2d
1004, 1008, 1011 (2d Cir. 1992).

### A.        Whether Successive Stops Should Be Evaluated Jointly or Separately

Before assessing the reasonableness of Foreste's investigatory detention, we must first resolve what in most cases is a straightforward question: How long was the relevant detention period?  The two stops lasted only about twenty-two and forty minutes respectively, but their combined length totaled about an hour. Foreste argues that the stops must be considered as one because they occurred less than half an hour apart and were, in his view, part of a joint drug investigation by Trooper Loiselle and Sergeant Albright.  He reasons that even if the stops would have each been individually reasonable, the stops' combined length was unreasonably intrusive in violation of the Fourth Amendment.

The Government, by contrast, argues that the reasonableness of each stop must be considered separately.  In its view, the stops should be individually evaluated regardless of any collaboration between the officers because each stop was supported by independent probable cause—speeding in Massachusetts and a rolling stop in Vermont—and, under *Whren v. United States*, a probable-cause-based traffic stop is justified regardless of the subjective motivations of the officer, 517 U.S. at 812–13.

This Court has not previously addressed the issue of successive investigatory detentions, but the idea that successive police stops may at least sometimes warrant collective consideration finds support in the decisions of our sister circuits. Most instructive is the Eight Circuit's decision in *United States v. Ilazi*, 730 F.2d 1120 (8th Cir. 1984). In that case officers observed two suspicious men while conducting routine surveillance to intercept drug traffickers at a Minneapolis airport. Both of the men were staggering as they walked, the officers noticed the men sniffing and inhaling deeply after placing their fingers near their noses, and one of the men was walking with some difficulty, continually stomping both feet as he went. The officers approached the men near an airport bar, inquired about their travel plans, and then thanked the men for their cooperation and left. *Id.* at 1121–22.

After leaving the bar, the officers explained the situation to two DEA agents who were also on duty at the airport. The DEA agents watched the two men as they left the bar and, like the officers, they noticed that one of the men walked with a strange gait—like "a two-year-old child with a dirty diaper." *Id.* at 1123. Based on this observation and their conversation with the officers, the DEA agents approached the men, asked to see their travel papers, and inquired

13

about their trip.  During this second round of questioning, the agents noticed a

bulge in the right boot of one of the men, which a subsequent search revealed to

be heroin.

In considering whether the investigatory stops were properly limited in

scope and duration, the court observed that to consider the reasonableness of

each investigatory stop individually would allow for police-officer

gamesmanship.  Officers could conduct successive, limited stops based on the

same reasonable suspicion in order to circumvent constitutional limitations on

duration:

> Here we have not one stop, but two.  Both must be limited in scope
> and duration.  To end our inquiry here, however, would allow law
> enforcement officials to circumvent these requirements by subjecting
> an individual to successive stops, each sufficiently limited in scope
> and duration to satisfy the conditions of an investigatory seizure,
> but collectively so intrusive as to be tantamount to an arrest.

*Id.* at 1125.  To prevent such gamesmanship, the *Ilazi* Court considered the stops

jointly and required that they be reasonable both individually and in

combination.  *Id.* at 1125–26.  Other circuits have reached similar conclusions,

holding that a second stop violates the Fourth Amendment where the reasonable

suspicion justifying it has already been dispelled by a prior stop, *United States v.*

*Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993), and that successive stops based on the

14

same information "strongly indicate" that an arrest has taken place, *United States v. Morin*, 665 F.2d 765, 769 (5th Cir. 1982), *abrogated on other grounds*, *see United States v. Corral-Franco*, 848 F.2d 536 (5th Cir. 1988).

We share these courts' concern regarding the intrusiveness of successive investigations based on the same reasonable suspicion and conclude that where the same[4] suspicion justifies successive investigations, and the officer conducting the subsequent investigation is aware of the prior investigation and the suspicion that supported it, the investigations' duration and scope must be both individually and collectively reasonable under the Fourth Amendment.

### B.     *Successive Traffic Stops Based on Separate Traffic Infractions*

The Government argues that even if successive investigations should be considered collectively where the second is essentially an extension of the first, the two investigatory detentions at issue in this case should be analyzed individually because each traffic stop was supported by independent probable cause.  To look beyond the probable cause justifying the stops, reasons the

---

[4] The same would be true were the suspicion justifying the second investigation generated from the first investigation rather than if it were identical to it.  In either case, the second stop can be viewed as an extension of the first stop, justifying the stops' joint evaluation for reasonableness under the Fourth Amendment.  *See United States v. Garcia*, 23 F.3d 1331, 1335–36 (8th Cir. 1994) (finding second stop unreasonable where based on information obtained during the first stop).

15

Government, would run afoul of *Whren*, under which a traffic stop based on probable cause is justified regardless of the officers' subjective motivations. 517 U.S. at 812–13.

But this argument misses the point. Everyone agrees that it was constitutionally permissible for both Trooper Loiselle and Sergeant Albright to stop Foreste's vehicle, regardless of their subjective motives, because both officers had probable cause to believe that a traffic infraction had occurred. At issue, however, is not the reasonableness of the stops themselves or even the reasonableness of the officers' decisions to extend the stops for further investigation. The question is whether the reasonableness of the investigations' scope and duration should be evaluated individually or in combination. As explained above, that question depends not on the officers' subjective motivations but on whether the investigatory detentions were based on the same or independent reasonable suspicion.

Ordinarily, of course, stops for separate traffic infractions are unrelated, and any extensions of those stops for investigation are unrelated as well. But looking only to whether independent traffic violations support successive traffic stops would create a rule subject to the same gamesmanship highlighted by the

Eighth Circuit in *Ilazi*.  One officer could stop a vehicle for a traffic infraction on a common drug corridor, become suspicious of the driver's nervousness or explanation for his trip, and then detain the vehicle while a drug-sniffing dog is called to the scene.  If the dog took too long to arrive (or, upon arriving, failed to detect any drugs), the officer could telephone a second officer down the road and apprise him of the situation.  The second officer could then follow the vehicle until spotting a second traffic infraction,[5] stop the vehicle, and, based on the suspicions relayed by the first officer, detain the vehicle a second time to again wait for a dog.  Through combination, successive stops could be extended to an unreasonably intrusive length even if each stop were supported by independent probable cause and each investigative detention itself were sufficiently limited in duration.

### C.     *Whether Foreste's Stops Should Be Considered Together*

In this case, Foreste argues that the reasonableness of the investigative detentions following each traffic stop should be considered together because, in his view, Trooper Loiselle and Sergeant Albright were working together, and

---

[5] Given the heavy regulation of automobile travel, it is unlikely that the officer would have much trouble spotting a violation if he set his mind to it.  Indeed, in this very case Sergeant Albright testified that, after talking with Trooper Loiselle, he set out toward the highway to intercept Foreste's vehicle planning "to try and find a motor vehicle violation if at all possible."  Supplemental App. 50.

each detained him as part of a joint drug investigation.  The record shows

otherwise.  Not only was each stop supported by a separate traffic infraction and

probable cause, but, critically, independent reasonable suspicion justified the

extension of each stop for further investigation.  During the Massachusetts stop,

Trooper Loiselle's suspicions revolved around the expired rental agreements and

uneasiness with the demeanor of Foreste and Cesar.  The hunch driving her

investigation seems to have been that the rental car was stolen.  She did not learn

from Albright that Foreste was suspected of transporting drugs until after she

had released the vehicle.

By contrast, the reasonable suspicion justifying Sergeant Albright's

detention of Foreste in Vermont was quite different.  Unlike Trooper Loiselle,

Albright knew that Foreste was implicated in drug trafficking, after stopping the

vehicle he observed what he believed to be marijuana "chafe" on Cesar's pants,

and as he spoke with Foreste he noticed white residue in his nostrils consistent

with the inhalation of powdered narcotics.  Because independent[6] grounds for

suspicion of criminal activity justified the extension of each stop, the

---

[6] Our point is not that the grounds for suspicion themselves must be distinct from those that justified the previous investigation—just that they must be independent.  The result would be the same were a second officer to independently identify the same grounds for suspicion and, unaware that those grounds had already once justified an investigative detention, detain the individual for investigation a second time.

reasonableness of the investigations' scope and duration should be evaluated separately.

### D.     *The Reasonableness of the Stops*

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). In determining whether a reasonable-suspicion-based extension of a traffic stop for investigatory purposes is reasonable, courts consider (1) whether the officer's action was justified at its inception; and (2) "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 682, 686 (1985).

Considered individually, both the Massachusetts and the Vermont stop were reasonable in duration and scope. Trooper Loiselle properly stopped Foreste and Cesar's vehicle for speeding. She then briefly asked Cesar and Foreste questions about where they were coming from and where they were heading, made a call to her dispatch officer to sort out the expired rental agreements, and placed a call to Sergeant Albright because the pair seemed suspicious. Loiselle suspected that criminal activity (auto theft) might be afoot,

and took a reasonable amount of time, a total of only twenty-two minutes, to dispel that suspicion.

Sergeant Albright's investigation was also reasonable. Albright stopped the vehicle for reasons that Foreste concedes were legitimate, and, after noticing what he believed to be marijuana "chafe" on Cesar's pants, proceeded to individually question him in the police cruiser while he examined the rental agreement, reviewed Cesar's driver's license, and checked for warrants. As Albright questioned Foreste, he noticed what appeared to be cocaine residue in Foreste's nostrils, and Albright then detained the vehicle about a half an hour longer (for a total of about forty minutes) to wait for Inspector Heberts to arrive with Duchess Corrie to perform an exterior scan of the vehicle.

Both investigations were conducted diligently, and their durations were within the range that this and other courts have found reasonable for similar canine investigations. *See, e.g.*, *Glover*, 957 F.2d at 1013 (thirty-minute stop); *United States v. McFarley*, 991 F.2d 1188, 1194 (4th Cir. 1993) (thirty-eight-minute stop).

## II.     Discovery of the Narcotics Canine's Field Records

Foreste argued before the district court that there was no probable cause to arrest him because the government failed to prove that the narcotics canine's alert was reliable.  With an eye toward challenging the dog's reliability, Foreste submitted with his motion to suppress a motion for discovery that included a request for all "[d]ocuments regarding the training, certification, and accuracy of Mark Heberts' narcotic detection dog."  Def.'s Mot. for Disc. at 3, *United States v. Foreste*, No. 12-0091 (D. Vt. Nov. 20, 2012).

After holding a suppression hearing, the district court scheduled a special hearing in April 2013 to allow for the cross-examination of the canine's handler, Inspector Heberts.  At that hearing, the court inquired about the Duchess Corrie's records.  The Government explained that in response to Foreste's discovery motion the Government "ha[d] provided all of the training records that exist regarding the dog's, you know, hits and training, and [her]—all of [her] training records."  J.A. 58.2.  The prosecutor, however, went on to explain that "I was made aware probably half an hour ago that there are—as you would expect, there are real-life records, you know, sort of day-to-day records about when the

K-9 performs a search of a vehicle roadside. Those are not any records that we have turned over. I don't think they're relevant." *Id.*

Foreste's attorney argued that these newly discovered field performance records should be provided to the defense according to his prior discovery request. The district court disagreed, reasoning that the Government did not need to turn over the dog's field performance records because "they're not controlled instances" and, as a result, "really do[n't] tell you anything." J.A. 58.3.

In so concluding, the district court appears to have been relying on the Supreme Court's decision in *Florida v. Harris*, 133 S. Ct. 1050 (2013). *Harris* involved the alert of a drug-sniffing dog that prompted the search of a vehicle and seizure of various ingredients for making methamphetamine. At the suppression hearing, the dog's handler testified that the dog had been trained and certified and had performed satisfactorily in training exercises. As for the dog's record of reliability in the field, however, the handler had kept records only of those alerts which had resulted in arrests. *Id.* at 1054. The trial court denied Harris's motion to suppress, but the Florida Supreme Court held that a drug-detecting dog's alert could *never* establish probable cause if the State failed to produce "evidence of the dog's performance history" including records

showing "how often the dog has alerted in the field without illegal contraband having been found." *Id.* at 1055 (quoting *Harris v. State*, 71 So. 3d 756, 769 (Fla. 2011)).

On appeal, the Supreme Court rejected Florida's rigid requirement as inconsistent with the totality-of-the-circumstances analysis that is supposed to govern probable cause determinations:

> The Florida Supreme Court flouted this established approach to determining probable cause. To assess the reliability of a drug-detection dog, the court created a strict evidentiary checklist, whose every item the State must tick off. Most prominently, an alert cannot establish probable cause under the Florida court's decision unless the State introduces comprehensive documentation of the dog's prior "hits" and "misses" in the field. (One wonders how the court would apply its test to a rookie dog.) No matter how much other proof the State offers of the dog's reliability, the absent field performance records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis.

*Id.* at 1056 (footnote omitted). The Court went on to explain that the Florida court's strict field records requirement was especially troubling given that field records are not even the most reliable indicator of a dog's performance:

> Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in

quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings.

*Id.* at 1056–57 (footnote omitted).

Accordingly, under *Harris*, field performance records are not required for the prosecution to establish probable cause. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1057. "If a bona fide organization has certified a dog . . . a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.*

Critically, however, *Harris* did not hold that field performance records are irrelevant—only that they are not *required*. In explaining why, the Court described how the risk of false positives and false negatives makes field records less probative than one might think. But that is far different from holding that they are entirely irrelevant. Instead, *Harris* explained, a probable cause hearing focusing on a dog's alert should proceed much like any other. The state should produce its evidence of the dog's reliability (including certifications and performance in controlled settings), the defendant should be given the

opportunity to dispute the dog's reliability, and the court should then weigh the competing evidence. The defendant might, for example, "contest the adequacy of a certification or training program . . . [or] examine how the dog (or handler) performed . . . ." *Id.* Although susceptible to misinterpretation, the dog's field performance records are relevant to that inquiry. Furthermore, the principle that a defendant "must have an opportunity to challenge such evidence of a dog's reliability," *id.*, would be stripped of its value if the defendant were not entitled to discover the evidence on which he would base such a challenge.

*Harris* counsels caution, but it does not dictate an about-face from this Court's long-standing position that a canine's field performance is relevant to the probable cause inquiry. *See, e.g.*, *United States v. Waltzer*, 682 F.2d 370, 372–73 (2d Cir. 1982) (probable cause based on field record of perfect accuracy). The district court's decision to deny Foreste's request for the narcotics canine's field performance records on the ground that they were "not controlled instances" and thus "do[n't] tell you anything" was based on an erroneous view of the law and constituted an abuse of the court's discretion.

25

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and VACATED and REMANDED in part for discovery of the narcotics canine's field performance records and reconsideration of Foreste's motion to suppress solely on the ground that the dog's alert was insufficiently reliable.